UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JOEL D. NASELROAD, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 14-389-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DENNIS MABRY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Plaintiff Joel Naselroad claims that the defendants violated his constitutional rights when they conducted a "knock and talk" that resulted in his shooting.  [Record No. 43, ¶¶ 46−52]  The plaintiff also alleges several related state law claims.  [*Id.*, ¶¶ 53−83]  This matter is pending for consideration of the motions for summary judgment filed by the defendant-officers and their respective employers.  [Record Nos. 95; 97; 100]  The defendants contend that they are entitled to summary judgment due to: (i) the doctrine of qualified immunity; (ii) the reasonableness of their actions on the day in question; and (iii) the fact that certain claims are merely "gap-fillers."  Finally, the defendants contend that the facts do not otherwise support the plaintiff's allegations.  For the reasons outlined below, the defendants' motions for summary judgment will be granted, and Naselroad's claims will be dismissed.

**I.**

On October 8, 2013, Captain Paul Howard contacted Detective Mark Craycraft, a deputy with the Clark County Sheriff's Department, regarding a Winchester resident's complaint concerning a marijuana growing operation in Clark County, Kentucky.  [Record No.

105, p. 6]  Craycraft called the complainant, Betsy Spengler, who informed that her daughter's boyfriend had seen the marijuana plants on the Naselroad's property when he was hunting on October 7, 2013.  [Record No. 108, p. 9]  Craycraft then contacted Paris Police Officer Robert Puckett and Trooper Dennis Mabry for the purpose of conducting a visit to the Naselroad residence.  [Record No. 105, p. 9]  Captain Howard contacted Deputy Sheriff John Gurley to meet the officers at a Winchester, Kentucky Wal-Mart before the visit.[1]  [Record No. 107, p. 6]

Around 10:00 a.m., the officers traveled to the Naselroad residence to conduct a "knock and talk," and attempt to obtain consent to search a property.  [Record Nos. 104, p. 48; 107, p. 10]  The officers traveled to the subject property in a marked cruiser.  [Record No. 107, p. 6]  Jeannie Naselroad, the plaintiff's mother, answered the officer's knock, and Detective Craycraft and Deputy Sheriff Gurley identified themselves and informed Ms. Naselroad about Spengler's complaint.  [Record No. 105, pp. 12−13]  Gurley was in uniform.  [Record No. 107, p. 6]  Detective Mabry and Officer Puckett remained at their cars during this initial interaction with Ms. Naselroad.  [Record No. 106, pp. 8−10]  At that point, the plaintiff claims that he walked out the rear entrance of the residence without knowledge that anyone was at the door.  [Record No. 103, pp. 91, 97]

Earlier that morning, while reviewing images from the trail camera maintained near the marijuana plants, Naselroad had discovered that an unknown masked man had been on his parents' property.  [Record No. 103, pp. 69−76, 87−94]  The man was Eric Miller, the boyfriend of witness Spengler's daughter, but Naselroad was not aware of his identity.

---

[1]     Craycraft was aware of a "standoff" that occurred at the Naselroad residence a few years earlier.  [Record No. 105, p. 7]

[Record Nos. 103, p. 93; 108, p. 20]  Jeannie Naselroad reports that her son stated he was going to kill the man in the images, and Naselroad admits that he may have made that statement.[2]  [Record Nos. 104, pp. 59−60; 103, p. 130]  Naselroad changed into camouflage and brought his gun when exiting the rear door of the house.  [Record No. 103, pp. 237−38, 256]  Craycraft claims that he saw Naselroad exiting the house and that he yelled, "he's going out the back," but Naselroad did not hear the statement.[3]  [Record Nos. 105, pp. 15−19; 103, pp. 133−34]  Jeannie Naselroad confirmed that Naselroad was still in the house when she opened the door to address the officers initial knock.  [Record No. 104, p. 164]

Subsequently, Craycraft moved toward the left side of the house, where he entered a "breezeway" between the house and a "smokehouse or root cellar."  [Record Nos. 105, pp. 23−27; 103, pp. 105−108]  When Craycraft was half-way down the breezeway toward the Naselroads' backyard, Naselroad heard him say, "hey buddy."  [Record No. 103, pp. 111, 113, 117]  Naselroad was standing in the yard near a cistern at the time.  [*Id.*, pp. 109−110]  Without realizing that Craycraft was a police officer and noticing that Craycraft had a holstered gun, Naselroad pulled out his gun and pointed it toward Craycraft.[4]  [*Id.*, pp. 111−12, 132, 147, 267]  At one point in his deposition, Naselroad asserted that he thought Craycraft pulled out

---

[2]     Naselroad has been diagnosed with antisocial personality and intermittent explosive disorders.  [Record No. 103, pp. 194; 198]  At the advice of his doctor, he stopped using the prescriptions for his mental health disorders one year prior to the events of October 8, 2013.  [*Id.*, p. 211; Record No. 104, p. 169]  Although mental health professionals had recommended that Naselroad not have access to guns, he owned several firearms.  [Record No. 103, pp. 142, 203, 205]

[3]     The plaintiff's mother heard someone scream that Naselroad had a gun.  [Record No. 104, pp. 177, 182]

[4]     The gun was in the "low ready" position.  [Record Nos. 100-12, p. 28; 103, p. 267]

his weapon at the same time, but that he did not point it at Naselroad, instead moving behind a wall.  [*Id.*, pp. 145−46]  However, in response to the question "you were the first to pull the gun; correct?," the plaintiff stated "I guess I was."  [*Id.*, p. 229]  Naselroad also admits that he may have attempted to place a bullet in the chamber of the gun.  [*Id.*, p. 231]

Meanwhile, Mabry had gone around a woodshed on the left side of the residence to enter the backyard.  [Record No. 100-12, pp. 27−28]  He was not wearing a bulletproof vest.  [*Id.*, p. 65]  Maybry did not enter the yard or draw his weapon until he heard Craycraft yell "[g]un, gun, he's got a gun."[5]  [*Id.*, p. 33]  Naselroard claims that he next heard Mabry yell "drop the gun" two times.[6]  [Record No. 103, p. 132]  Naselroad turned to look at Mabry, then looked back at Craycraft.  [*Id.*, pp. 117−19; Record No. 100-12, p. 36]  By the time he heard Mabry identify himself as a police officer, Mabry shot Naselroad.  [Record No. 103, p. 133]  Only about 15 seconds passed between the time Naselroad exited the rear door and Mabry's firing of his weapon.  [*Id.*, p. 230]    Naselroad remembers some of the officers trying to administer aid to him at that point.  [*Id.*, p. 136]  Naselroad states that he was not aware of Gurley's and Puckett's presence until after he was shot.  [*Id.*, p. 151]  Jeannie Naselroad confirmed that she could see Puckett in front of the house until after the shooting.  [Record No. 104, pp. 185−86]

---

[5]    Naselroad admits that Craycraft "may have" yelled "gun" several times when Naselroad pointed the gun at him.  [Record No. 103, p. 134]

[6]    Mabry contends that he yelled, "State police.  Drop the gun," four or five times.  [Record No. 100-12, p. 29]  He also claims that Naselroad pointed the gun at him and then back at Craycraft.  [*Id.*, pp. 29, 36]  However, the Court has disregarded these allegations, taking the facts in the light most favorable to the plaintiff.  The Court notes that Mabry was wearing a badge on his belt, but he and Craycraft were in plain clothes.  [*Id.*, pp. 30; 32]

Following the events of October 8, 2013, the Kentucky State Police charged Naselroad with two counts of wanton endangerment, cultivation of marijuana, possession of marijuana, and possession of drug paraphernalia.  A state grand jury indicted him on these charges, adding a third wanton endangerment charge.  [Record Nos. 43, ¶ 36; 95-7]  Thereafter, Naselroad was convicted of possessing marijuana and drug paraphernalia, but acquitted on the wanton endangerment and marijuana cultivation charges.  [Record Nos. 95-8; 97-8]

On October 6, 2014, Naselroad filed the present action, alleging constitutional violations by the defendants under 42 U.S.C. § 1983, as well as related state law claims. [Record No. 1]  The next day, he filed an Amended Complaint.  [Record No. 5]  Following the entry of Memorandum Opinions regarding several motions to dismiss and the filing of Naselroad's Second Amended Complaint, the following claims remain: (i) Fourth Amendment excessive force and/or search and seizure claims under 42 U.S.C. § 1983 against Mabry, Craycraft, Puckett, and Gurley;[7] (ii) civil conspiracy claims under 42 U.S.C. §§ 1983 and 1985

---

[7]      Although the Fourth Amendment claim against Gurley was dismissed based on Naselroad's concession [Record No. 42, p. 5], the plaintiff reasserted it in the Second Amended Complaint, with further factual support.  [Record No. 43, ¶¶ 40, 46−47]  Thus, the Court will address this claim in its analysis.  *See, e.g., Bertanelli v. Ryan*, No: CV-11-1346-PHX-PGR(LOA), 2012 WL 4951205, *2 (D. Ariz. May 22, 2012) (prohibiting reassertion of dismissed claims through amended complaint where plaintiff failed to cure deficiencies).   Only the Fourth Amendment *search and seizure* claim remains against Puckett.  [Record No. 42, p. 8]  Even though Naselroad reasserted the excessive force claim in the Second Amended Complaint [Record No. 43, ¶ 42], the record does not support his allegations that Puckett entered the curtilage prior to the shooting or was otherwise involved in the use of excessive force.  *See id.*  [Record No. 104, pp. 185−86]  To the extent Naselroad presently asserts the excessive force claim against Puckett, the Court notes that the same reasons expressed in the prior ruling apply here—the events transpired too quickly to trigger Puckett's duty to protect.  *See Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 506 (6th Cir. 2007).

Although the Second Amended Complaint alleges claims against the Kentucky State Police, the Court determined that said defendant is protected by Eleventh Amendment immunity from the federal claims and official governmental immunity from the state law claims.  [Record

- 5 -

against the defendant-officers; (iii) municipal liability claims under § 1983 against Berl Purdue, in his official capacity, Clark County, and the City of Paris; (iv) an assault and battery claim against Mabry; (v) an intentional infliction of emotional distress ("IIED") claim against Mabry and Puckett;[8] (vi) a negligence claim against Mabry and Puckett, and the entity-defendants, through the doctrine of *respondeat superior*;[9] (vii) a negligent supervision claim against the City of Paris;[10] (viii) a false imprisonment claim against the defendant-officers, and the entity-defendants, through the doctrine of *respondeat superior*; and (ix) a malicious prosecution claim against the defendant-officers, and the entity-defendants, through the doctrine of *respondeat superior*.  [Record Nos. 43, pp. 9−17; 35, p. 2; 42, pp. 15−16]

No. 35, p. 1]  The Second Amended Complaint and the summary judgment briefs do not address the Eleventh Amendment or sovereign immunity.  Thus, the Second Amended Complaint did not revive those claims.  *See, e.g.*, *Burgeson v. Downing*, No. 3:06cv1663(WWE)(HBF), 2009 WL 185593, *1 (D. Conn. Jan. 22, 2009) (dismissed claims against trooper defendants in their official capacities could not be revived by filing of amended complaint).

[8]     While the Second Amended Complaint alleges intentional infliction of emotional distress against Craycraft and Gurley, the Court dismissed that claim as against those defendants because it is a gap-filler under Kentucky law.  [Record No. 42, p. 12]  The plaintiff does not address that ruling in his Second Amended Complaint.  In any event, as explained below, summary judgment will be granted in all defendants' favor with respect to the IIED claim.

[9]     Even though the Second Amended Complaint asserts a negligence claim against Craycraft and Gurley, the plaintiff fails to provide any reasons why the Memorandum Opinion dismissing those claims does not still apply.  [Record No. 42, p. 13]  However, the Court includes a discussion of those defendants in its analysis of those claims.

[10]     The negligent supervision claim was dismissed as to Clark County and Sheriff Purdue, in his official capacity.  [Record No. 42, p. 13]  The Second Amended Complaint and the summary judgment briefs offer no explanation why sovereign immunity would not still apply to those defendants with respect to this claim.  As a result, the Court still finds that the defendants are entitled to sovereign immunity regarding this claim.  *See Edmonson Cnty. v. French*, 394 S.W.3d 410, 414 (Ky. Ct. App. 2013).  In addition, the negligent supervision claim was dismissed as to Purdue, in his individual capacity, due to qualified immunity.  [Record No. 42, p. 14]  Naselroad has failed to produce evidence that Purdue's failure to promulgate a "knock and talk" policy was the result of bad faith.  Consequently, this claim cannot be maintained against Purdue.  *See Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).

The claims remain with respect to Officers Craycraft and Gurley in their individual capacities and in their official capacities as officers of the Clark County Sheriff's Department. [Record No. 35]  Regarding Officer Puckett, the claims remain against him in his individual capacity and in his official capacity as an officer of the Paris Police Department.[11]  Naselroad's claim against Mabry in his official capacity as an officer with the Kentucky State Police was dismissed.  [*Id.*]  For these claims, the plaintiff seek to recover compensatory and punitive damages, as well as injunctive relief requiring proper police training.  [Record No. 43, pp. 17−18]

On February 8, 2016, Craycraft, Gurley, Purdue, and Clark County filed a motion for summary judgment.  [Record No. 95]  Next, Puckett and the City of Paris filed their motion for summary judgment, making several similar arguments.  [Record No. 97]  Lastly, Mabry submitted a motion for summary judgment, reiterating similar contentions.  [Record No. 100]

## II.

Summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty*

---

[11]     The Second Amended Complaint only addresses the "individual capacities" of the defendant-officers in the separate counts [Record No. 43, ¶¶ 46−83]; however, it addresses their official capacities in other sections.  [*Id.*, ¶¶ 15−21]

*Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

The defendants make several arguments in support of their motions. With respect to the Fourth Amendment search and seizure and excessive force claims in Count I, they assert that they are shielded by qualified immunity. [Record Nos. 95-1, pp. 6–17; 97, pp. 7–18; 100-2, pp. 19–31] Regarding the municipal liability claim, the affected defendants contend that Naselroad has failed to support his "inaction" claim with evidence. [Record Nos. 95-1, pp. 18–20; 97, pp. 18–20] For the civil conspiracy claim, the defendants argue that they are either protected by qualified immunity or that the plaintiff has not supported his allegations with relevant evidence. [Record Nos. 95-1, p. 20–23; 97, pp. 20–21; 100-2, pp. 32–33]

Regarding the assault and battery claim, Mabry asserts that he is entitled to qualified immunity and that such a claim is otherwise treated as an excessive force claim. [Record No. 100-2, pp. 34–35] With respect to the IIED allegation, the defendants contend that it is not appropriate to assert such a claim where the plaintiff can obtain emotional distress damages through other causes of action. [Record Nos. 97, p. 26; 97, pp. 23–25; 100-2, p. 35] For the negligence claim, the defendants assert that no "special relationship" existed between them and Naselroad and that the events transpired too quickly to impose a duty to protect upon them. [Record Nos. 97, p. 25; 97, pp. 25–26; 100-2, p. 36] Finally, they aver that the plaintiff fails to support the negligent supervision, false imprisonment, and malicious prosecution claims

with evidence.  [Record Nos. 95-1, pp. 24−26; 97, pp. 27−30; 100-2, pp. 37−38]  Each count will be addressed in turn.

### A.      Count I – Fourth Amendment Claims Under 42 U.S.C. § 1983

In Count I, Naselroad alleges that the defendant-officers and their respective entities violated his Fourth Amendment rights by their participation in the October 8, 2013 events.[12] [Record No. 43, ¶¶ 46−47]  Craycraft, Gurley, Puckett, and Mabry, in their individual capacities, contend that they are shielded by the doctrine of qualified immunity.  [Record Nos. 95-1, p. 6; 97, p. 7; 100-2, p. 19]  Clark County and the City of Paris claim that the undisputed facts fail to support a municipal liability claim against them under 42 U.S.C. § 1983.  [Record Nos. 95-1, p. 18; 97, p. 18]

Government officials performing "discretionary functions" are shielded from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (internal quotation marks and citation omitted).  First, the Court determines whether the facts "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Second, the Court examines "whether the right was clearly established."  *Id.*  Once a defendant raises this defense, the plaintiff bears the

---

[12]        Naselroad also makes an Eighth Amendment claim.  [Record No. 43, ¶ 47]  It appears that he intends to make a "cruel and unusual punishment" claim; however, pretrial detainee claims are more appropriately addressed by the Fourth and Fourteenth Amendments. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)); *Peete v. Metro. Gov't of Nashville and Davidson Cnty.*, 486 F.3d 217, 221 (6th Cir. 2007).  The Court presumes that Naselroad's Fifth Amendment claim refers to due process.  In the context of this case, any due process concerns are addressed by the Fourth Amendment standards.  *See United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997).

burden of demonstrating that the defendant is not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

### 1.      Search and Seizure

Naselroad contends that the defendant-officers initially violated his Fourth Amendment rights by making a warrantless entry onto his curtilage.  [Record No. 43, ¶ 35]  However, he concedes that his claim against Puckett cannot survive summary judgment.  [Record No. 112, p. 4]  Only Mabry entered the backyard before the shooting occurred, and the parties seem to agree that the backyard constituted the curtilage here in issue.  [*See* Record No. 97, p. 17.]  In any event, a backyard such as the one in the photographs is typically considered curtilage.  *See Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 601 (6th Cir. 1998).  Craycraft remained in the "breezeway" until after the shooting.  [Record No. 103, p. 145]  The plaintiff claims that the breezeway is also "curtilage" protected by the Fourth Amendment.  [Record No. 111, p. 9]

### a.      Curtilage

"The Fourth Amendment provides that individuals shall be free from warrantless unreasonable searches and seizures in their 'persons, houses, papers, and effects.'"  *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 651 (6th Cir. 2006) (quoting U.S. CONST. amend. IV).  This protection applies to a house's "curtilage," which harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'"  *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States,* 116 U.S. 616, 630 (1886)).  The Supreme Court has identified four factors for determining whether an area near a dwelling is "curtilage." They are: (1) the proximity of the area to the home; (2) "whether the area is within an enclosure surrounding the home;" (3) the nature and uses of the area; and (4) the steps the resident has taken to protect the area from observation.  *United States v. Dunn*, 480 U.S. 294, 301 (1987).

- 10 -

The photographs in the record demonstrate that the breezeway was directly beside the residence, and Naselroad stated that the rear door of the house leads into the breezeway. [Record Nos. 95-9, p. 1; 100-9, p. 2; 103, pp. 98−99]  Proximity suggests that the homeowner had a reasonable expectation of privacy.  *See United States v. Stitt*, No. 14-6158, 2016 WL 520048, *2 (6th Cir. Feb 10, 2016).  "But proximity alone does not suffice."  *Id.*  Regarding the second factor, the defendants argue that the fact that the Naselroads did not build a fence around the area indicates that they did not have an expectation of privacy there.  [Record No. 100-2, p. 22]  However, the photograph shows that the breezeway was bounded on one side by the home, the other side by the backyard, and the other side by a smokehouse or root cellar belonging to the Naselroads.  [Record Nos. 95-9; 103, pp. 105−108, 271]  Thus, the breezeway was largely enclosed.

Regarding the third factor, there is no evidence that the public used the breezeway—instead, only immediate family members used it.  [Record No. 103, pp. 259−60]  *Compare id.* ("Testimony established that visitors parked cars in the turnaround—decidedly not an activity associated with the privacies of life.").  While "*public* drives, sidewalks, or walkways (even those which lead to a rear side door)" are not within the curtilage of the home when they are "not enclosed by a gate or fence," it does not appear that this was a "public" breezeway.[13]  *See United States v. French*, 291 F.3d 945, 953 (7th Cir. 2002) (emphasis added).  With respect to the fourth factor, the Naselroads had not taken many steps to protect the area from observation; however, as discussed above, such steps were somewhat unnecessary due to the structures on two sides of the breezeway.  *Compare with United States v. Clay*, No. 4:10-

---

[13]     Although the breezeway did not contain items connected with "the activities and privacies of domestic life," testimony indicated that it was only used privately.  *See Dunn*, 480 U.S. at 303.

cr-31, 2011 WL 2224606, *5 (E.D. Tenn. Apr. 11, 2011) (focusing on the lack of physical or visual barriers on any sides of the subject area). Based on the four *Dunn* factors, the breezeway was part of the curtilage of the home. As a result, the Fourth Amendment's protections applied to that area. *See Dunn*, 480 U.S. at 301.

### b.      Extension of Knock and Talk

However, the defendants argue that a proper knock and talk may extend beyond the front door under some circumstances. [Record Nos. 95-1, p. 12; 100-2, p. 21] "A law-enforcement officer may enter a home's curtilage without a warrant if he has a legitimate law-enforcement objective, and the intrusion is limited." *Turk v. Comerford*, 488 F. App'x 933, 947 (6th Cir. 2012). In *Hardesty*, the Sixth Circuit held that "where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." 461 F.3d at 654.

Here, Jeannie Naselroad answered the door when the officers knocked. [Record No. 105, pp. 12–13] As a result, this case is dissimilar to *Hardesty*. The defendants have not cited any cases where an intrusion onto the curtilage was permitted after a resident opened the door pursuant to a knock and talk. In light of *Hardesty*'s focus on the fact that the occupants did not answer the door, the Court sees no reason to extend the holding to cover the circumstances presented. *See Hardesty*, 461 F.3d at 654.

### c.      Exigent Circumstances

The defendants also argue that Craycraft's and Mabry's entry onto the curtilage was justified by exigent circumstances. "Exigent circumstances are situations where real immediate and serious consequences will certainly occur if a police officer postpones action

to obtain a warrant." *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (internal quotation marks and citation omitted).  Officers must have had "probable cause to believe a crime was being committed or evidence of a crime would be found," and exigent circumstances must justify the warrantless entry.  *United States v. Domenech*, 430 F. App'x 392, 396 (6th Cir. 2011).  Exigent circumstances include: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) need to prevent a suspect's escape; and (4) risk of danger to the police or others.  *Williams*, 354 F.3d at 503.

Craycraft asserts that the "risk of danger" and "imminent destruction of evidence" exigencies justified the warrantless entry onto the curtilage in this case.  [Record No. 95-1, p. 14]  In *Williams*, the court explained that the risk of danger exigency particularly applies where the officers are acting in a non-traditional law enforcement capacity, such as entering a burning building.  *Id.*  Courts have found the existence of such an exigency where officers have a reasonable belief that a suspect has a weapon and the suspect demonstrates a willingness to use the weapon.  *See United States v. Ponder*, 240 F. App'x 17, 20 (6th Cir. 2007).  Although a suspect's "willingness to use" a weapon usually requires the occurrence of fired gunshots, "brandishing" a weapon may indicate a suspect's willingness to use the weapon.  *See Ewolski v. City of Brunswick*, 287 F.3d 492, 502 (6th Cir. 2002).  The plaintiff's "subjective assessment of whether his behavior posed an immediate threat is not the appropriate lens" through which to view the officer's actions.  *Deffert v. Moe*, 111 F. Supp. 3d 797, 807 (W.D. Mich. 2015).  Instead, the Court conducts an objective inquiry by looking to the facts and circumstances known to the officer.  *Id.*

Here, Craycraft knew that a standoff had occurred at the Naselroad residence several years earlier.  [Record No. 105, p. 7]  As he was asking Naselroad's mother about marijuana

- 13 -

plants allegedly contained in her backyard, he saw Naselroad leaving through the rear exit dressed in camouflage. [Record No. 103, pp. 237−38; 256]  When Craycraft went to the left side of the driveway, he saw Naselroad in the backyard with a gun.  [Record No. 105, pp. 25−26]  Thus, the first prong of the *Ponder* test is satisfied.  240 F. App'x at 20.  However, taking the facts in the light most favorable to the nonmoving party, Craycraft entered the breezeway before Naselroad demonstrated a willingness to use the weapon.  *See Ewolski*, 287 F.3d at 502; *Deffert*, 111 F. Supp. 3d at 808.   [Record No. 103, pp. 111, 113, 117] Consequently, the "risk of danger" exigency did not justifiy Craycraft's initial entrance into the breezeway.

With regard to Mabry, Naselroad does not offer any explanation why the side of the woodshed would be considered "curtilage,"[14] and he largely takes issue with Mabry's entrance into the backyard. [Record No. 110, p. 11]  Mabry was in the driveway until he heard Craycraft exclaim, "he's going out the back."  [Record Nos. 105, pp. 15−19; 106, p. 11]  At that point, Mabry was aware of a tip that marijuana plants were in the backyard area, and he knew that Craycraft and Gurley were conducting a knock and talk. [Record No. 106, pp. 7, 20]  Further, Naselroad is unable to dispute that Craycraft mentioned that Naselroad had a gun, and Jeannie Naselroad heard someone mention a gun. [Record Nos. 104, pp. 177, 182; 106, p. 32]  Thus,

---

[14]       Naselroad does claim that the officers "had no permission to be in the side or rear area" of the residence, but he makes no argument why those areas qualify as curtilage.  [Record No. 110, p. 13]  It is his burden to show that the officers violated his clearly established rights.  Without explaining why the opposite side of an adjacent woodshed constitutes curtilage of the home, Naselroad gives the Court no reason to conclude that Mabry violated his clearly established constitutional rights by running through that area.  *See Silberstein*, 440 F.3d at 311.  Further, regarding Craycraft standing in the driveway, the Court notes that driveways typically used by non-residents to enter the house are generally not considered curtilage. *See Stitt*, 2016 WL 520048, at \*2.

Mabry knew that the suspect had a weapon before he entered the backyard-curtilage area. But, at that point, he did not have any reason to believe that Naselroad had demonstrated a willingness to use a weapon. As a result, the risk of danger exigency[15] does not justify Mabry's entrance into the backyard. *See Ewolski*, 287 F.3d at 502.

However, the "imminent destruction of evidence" exigency applies here. With this exigent circumstance, "[p]robable cause exists where, given the totality of the circumstances, there is a reasonable grounds for the belief of wrongdoing, which is 'supported by less than *prima facie* proof but more than mere suspicion.'" *United States v. Johnson*, 457 F. App'x 512, 516 (6th Cir. 2012) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). Craycraft had received a recent complaint from an identified witness regarding marijuana growing in the Naselroads' backyard. [Record No. 108, p. 9] Additionally, he was asking Jeannie Naselroad about the marijuana as Naselroad was preparing to leave. Consequently, he could reasonably believe that Naselroad overheard the conversation. [Record No. 105, p. 53] Once he saw Naselroad leaving the rear exit in camouflage, he could reasonably infer that Naselroad intended to destroy the potential marijuana plants. *See, e.g.*, *United States v. Sanguineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988) (relying on undercover informant's tips regarding cocaine in apartment).

The same goes rationale applies to Mabry. He knew that a man was leaving the house to enter a backyard allegedly containing marijuana plants while officers were at the door asking

---

[15]     Naselroad contends that the "risk of danger" exigency cannot apply here because Mabry admitted he was concerned about the destruction of evidence, not officer safety. [Record No. 110, p. 15] However, the test is an objective one and Mabry's subjective intentions are irrelevant. *See Deffert*, 111 F. Supp. 3d at 807.

for consent to search.  [Record No. 106, pp. 7, 20]  He also knew that the individual had a gun. It was reasonable for him to believe that he needed to enter the backyard to halt the imminent destruction of evidence and that waiting for a warrant would not have been feasible.[16] *Compare United States v. Elkins*, 300 F.3d 638, 656 (6th Cir. 2002) (exigent circumstances supported warrantless search where suspect was aware that police had detained his colleague outside) *with United States v. Radka*, 904 F.2d 357, 362 (6th Cir. 1990) (no exigent circumstances where police arrested confederate far from house); *see also United States v. Hogan*, 539 F.3d 916, 922−23) (8th Cir. 2008) (exigent circumstances where officers heard methamphetamine transaction, conducted knock and talk, and man fled after making eye contact).

In addition, the "warrantless entry was limited in scope and proportionate to the exigency excusing the warrant requirement."  *See Sanguineto-Miranda*, 859 F.2d at 1513 (internal quotation marks and citation omitted).  The officers could have entered the home but, instead, they went around the house and into the breezeway and backyard to prevent the

---

[16]    *See also Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007) (where the officer claims qualified immunity due to a good-faith reliance on the report of other officers, the Court considers: "(1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act").

destruction of the marijuana plants.[17]   In summary, Craycraft and Mabry did not violate Naselroad's rights by entering upon his curtilage without a warrant.[18]

Even if the imminent destruction of evidence exigency did not apply, the plaintiff has not shown that it is "clearly established" that the exigency was inapplicable.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011) (an officer violates clearly established law if "every reasonable official would have understood that what he [was] doing violate[d] that right") (internal quotation marks and citation omitted).  Therefore, Craycraft and Mabry are entitled to qualified immunity with respect to the plaintiff's Fourth Amendment search and seizure claim under 42 U.S.C. § 1983.  *See Saucier*, 533 U.S. at 201.

### d.      Gurley and Puckett

As explained above, the Fourth Amendment search and seizure claims remain regarding Gurley and Puckett.  Regarding Gurley, the plaintiff contends that he "remained at the front door of the Plaintiff's residence to assure no one inside the house took action adverse to the other officers while they wrongfully pursued the Plaintiff . . ."  [Record No. 43, ¶ 40] The plaintiff seems to argue that Gurley overstayed his welcome at the front door in violation of the knock and talk procedure.  However, the evidence does not indicate that the knock and talk was completed.  Instead, the officers' conversation with Jeannie Naselroad was interrupted

---

[17]      Some cases indicate that marijuana is not easily destructible.  *See, e.g.*, *United States v. White*, 70 F.3d 1273 (table), *3 (6th Cir. 1995).  However, other cases indicate that officers may reasonably believe that imminent destruction of marijuana constitutes an exigent circumstance.  *See, e.g.*, *Elkins*, 300 F.3d at 656.

[18]      Mabry briefly argues that the "hot pursuit of a fleeing felon" exigency applies.  [Record No. 100-2, p. 24]  Cultivation of marijuana can be a felony in Kentucky.  Ky. Rev. Stat. § 218A.1423.  But the facts of the case do not fit the paradigm for a "hot pursuit" case because there was no "immediate or continuous pursuit of the [plaintiff] from the scene of the crime."  *See Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

by the events concerning Naselroad.  [Record Nos. 104, pp. 86, 98; 107, pp. 13−15]  Moreover, the events transpired in a matter of seconds.  [Record No. 104, pp. 99−100]  As a result, Gurley did not violate Naselroad's rights by remaining at the door while Craycraft went into the breezeway.  And Naselroad certainly cannot establish the Gurley clearly violated federal law by remaining at the door for a few seconds.  *See Saucier*, 533 U.S. at 201; *Smith v. City of Wyoming*, __ F.3d __, 2016 WL 1533998, *10−11 (6th Cir. Apr. 15, 2016) (officer did not violate clearly established law by briefly preventing closure of a door and thereby slightly extending knock and talk).

Regarding Puckett, Naselroad has decided not to contest his request for summary judgment on the Fourth Amendment search and seizure claim.  [Record No. 112, p. 4]  Thus, summary judgment will be granted in favor of Gurley and Puckett concerning that claim.

### e.    Segmenting

The defendants argue that, even if the warrantless entry onto the curtilage was unreasonable, the Court should segment the actions leading up to the entry from the subsequent use of force.  [Record Nos. 95-1, p. 16; 100, p. 31]  In *Dickerson v. McClellan*, the Sixth Circuit held that a "violation of the knock and announce rule is conceptually distinct from the excessive force claim," segmenting the two claims.  101 F.3d 1151, 1162 (6th Cir. 1996); *see also Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 37 (6th Cir. 2005) (segmenting warrantless entry claim from excessive force claim.  However, sometimes the events are "not so easily divided."  *Claybrook v. Birchwell*, 274 F.3d 1098, 1104 (6th Cir. 2001) (holding that events of initial firefight influenced analysis of shots fired after suspect moved to a position behind concrete steps).  Where an officer entered a dark hallway of a house where he heard threatening shouting and then opened fire upon encountering occupants, the court did not

- 18 -

segment the fact that the officer failed to identify himself from the shooting.  *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991).  In particular, the *Yates* court reasoned that the detective's failure to identify himself "was integral to the circumstances leading directly to the use of deadly force."  *See Chappell v. City of Cleveland*, 585 F.3d 901, 915 (6th Cir. 2009) (examining *Yates*, 941 F.2d at 447).

The segmenting approach is appropriate under the circumstances of the present case.  In *Claybrook*, the court segmented the officers' approach and confrontation of the suspect from the subsequent two segments involving firefights.  274 F.3d at 1105.  The court did not separate the second and third segments because the reasonableness of force used in the second influenced the activities in the third.  *Id.*  Here, on the other hand, the circumstances do not involve two segments relating to use of force.  Instead, they involve a warrantless entry and a subsequent shooting.  Further, *Yates* does not mandate that the Court consider the effect of the warrantless entry into the backyard on the subsequent shooting.  Rather, *Yates* requires the Court to consider how the officers' alleged failure to identify themselves influenced the shooting.  *See Yates*, 941 F.2d at 447.  Consequently, the Court will consider such claimed failure in the analysis that follows.

### 2.    Excessive Force

"[I]ndividuals have a constitutional right to be free from excessive force . . ."  *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006).  Excessive force is determined under an "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  The Court must balance the quality of the intrusion against the countervailing governmental interests.  *Id.* at 396.  The Supreme Court has identified three factors that influence the analysis: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or

others' safety; and (3) whether the suspect actively resisted arrest or attempted to flee. *Id.* An officer can be held liable for excessive force if he actively participated in the use of force, supervised the officer who used such force, or owed a duty of protection against the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

### a.    Craycraft Drawing His Weapon

With respect to Craycraft, the duty-to-protect basis for liability has been foreclosed, and Naselroad does not seem to allege a supervisory claim. [Record No. 42, p. 8] Instead, he asserts that Craycraft actively participated in the use of force by drawing his weapon. [Record No. 43, ¶ 28] Therefore, the question is whether it was reasonable for Craycraft to draw the weapon. Naselroad's assertion that he and Craycraft drew their weapons simultaneously does not raise a genuine issue of fact. [Record No. 103, p. 133] "Evidence suggesting a mere possibility is not enough to get past the summary judgment stage." *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986). A plaintiff's "inability to recollect" a fact "makes his attempt to rebut the defendant's evidence" only a "mere possibility." *Hatfield v. Johnson Controls, Inc.*, 791 F. Supp. 1243, 1248 n.2 (E.D. Mich. 1992); *see also Totman v. Louisville Jefferson Cnty. Metro. Gov't*, 391 F. App'x 454, 465 (6th Cir. 2010) (concluding that plaintiff failed to raise genuine issue of fact concerning whether particular officer was involved in use of excessive force when he expressed uncertainty regarding which officers were involved). Here, Craycraft unequivocally stated that Naselroad was the first to draw his weapon, whereas Naselroad first claimed, with uncertain language, that they drew their weapons simultaneously and later admitted that he may have drawn his weapon first. [Record Nos. 103, pp. 146, 229; 105, p. 55] This type of inconsistency does not raise a genuine dispute of fact. *See Gregg*, 801 F.2d at 863; *Totman*, 391 F. App'x at 465.

- 20 -

"Officers may proceed to point their weapons at an individual whom they honestly, even if mistakenly, believe to be dangerous." *Meyers v. Mitrovich*, No. 1:14CV1604, 2015 WL 413804, *12 (N.D. Ohio Jan. 30, 2015) (citing *Kelley v. McCafferty*, 283 F. App'x 359, 364 (6th Cir. 2008)).  The Sixth Circuit has adopted the Fifth Circuit's rationale distinguishing between "showing force" and "actually using force." *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir. 1989).  Additionally, deadly force may be used if a suspect threatens an officer with a weapon. *Tenn. v. Garner*, 471 U.S. 1, 11 (1985).

Even if Craycraft drew his weapon simultaneously with Naselroad doing so, it is questionable whether such an act even constitutes excessive force.  *See Collins*, 892 F.2d at 497; *Kelley*, 283 F. App'x at 364 (where police entered an active drug house with an unknown number of people and believed weapons might be present, they were entitled to draw their weapons upon entry); *Johari v. City of Columbus Police Dep't*, 186 F. Supp. 2d 821, 827−28 (S.D. Ohio 2002) (officer did not have "affirmative duty to refrain" from pointing gun at suspect who was combative and mistakenly suspected of carrying a gun).  Here, Naselroad admits that Craycraft did not even point the gun at him.  [Record No. 103, p. 146, 267]  Further, once Naselroad drew his weapon and pointed it in Craycraft's direction, Craycraft was entitled to do the same.  *See Garner*, 471 U.S. at 11.  [Record No. 103, pp. 111−12; 132; 147]  This case simply does not resemble cases like *Dickerson*, where the witnesses "offered inconsistent statements on the crucial question" of whether the suspect pointed his gun at an officer.[19]  101 F.3d at 1163.

---

[19]     Further, Craycraft was not required to diffuse the situation by putting his weapon down because Naselroad admits that he may have tried to load the gun in Craycraft's presence.  [Record No. 103, p. 231]

### b.        Knock and Announce

Naselroad argues that the officers acted recklessly by failing to identify themselves, causing him to draw his gun as a lawfully-armed person entitled to protect his property from an unknown, armed intruder.  [Record No. 111, p. 12]  The Fourth Amendment requires police officers to "knock and announce their presence and authority before entering a residence . . ." *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996).  The knock and announce rule "addresses the interests of *all* inhabitants of a private dwelling."  *Ingram v. City of Columbus*, 185 F.3d 579, 590 (6th Cir. 1999) (emphasis added) (cautioning against the assumption that "the parties within a home are aware of the officers' presence and purpose[,] [which] serves to protect officers themselves from property owners who might otherwise mistake them for unlawful trespassers").  The rule applies to entries upon a home's curtilage, as well.  *See United States v. Ashby*, No. CRIM.A. 04-105-C, 2006 WL 120238, *2 (W.D. Ky. Jan. 17, 2006).

To avoid the knock and announce requirement, an officer must reasonably suspect that knocking and announcing his presence would (1) be dangerous or futile, or (2) inhibit effective investigation of the crime at issue.  *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).  While a certain set of exigent circumstances "may excuse the warrant requirement, the law allows for the possibility that those same circumstances might not excuse the knock and announce requirement . . ."  *Ingram*, 185 F.3d at 588.

In *Bates*, the court stated that the imminent destruction of evidence exigency may dispose of the requirement to knock and announce.  84 F.3d at 796.  But this exigency does not operate as a blanket exception to the knock and announce rule.  *Ingram*, 185 F.3d at 589; *see also United States v. Spikes*, 158 F.3d 913, 926 (6th Cir. 1998).  Instead, exigent circumstances in this context exist where (i) "persons within the residence already know of the

officers' authority and purpose;" (ii) "officers have a justified belief that someone within is in imminent peril of bodily harm; or (iii) "officers have a justified belief that those within are aware of their presence and engaged in escape or the destruction of evidence."  *United States v. Smith*, 386 F.3d 753, 759 (6th Cir. 2004) (quoting *Bates*, 84 F.3d at 795); *United States v. Watson*, 63 F. App'x 216, 221 (6th Cir. 2003).

In the present case, the officers properly announced their presence to Jeannie Naselroad while performing the "knock and talk" at the front door.  [Record Nos. 104, p. 86, 96, 113−15; 105, p. 13]  However, the circumstances quickly changed, entitling the officers to enter the curtilage of the house to prevent the imminent destruction of the marijuana.  At that point, the officers were required to again announce their presence to Naselroad unless such announcement would have been dangerous, futile, or would have inhibited the investigation. *See Ingram*, 185 F.3d at 590; *Richards*, 520 U.S. at 394.

The police arrived at the house in a marked cruiser.  [Record No. 107, p. 6]  When Craycraft and Gurley were at the door, Gurley was in uniform and was able to see Naselroad. [*Id.*, pp. 6, 14]  It would be reasonable for the officers to conclude that Naselroad saw the uniform and/or cruiser, especially when he was exiting the house in camouflage at the exact time that they were at the door.  [*Id.*, p. 14; Record No. 105, p. 15]  Further, he walked out of the kitchen and towards the back door while the conversation about marijuana was taking place.  [Record Nos. 103, p. 99; 105, p. 15]  Naselroad claimed that the space between the entrances was 30 to 40 feet.  [Record No. 103, p. 99]  As a result, he was even closer to the officers before he made it to the rear door.  Examining the photograph, the Court notes that it would not be unreasonable for the officers to conclude that Naselroad overheard their conversation or was aware of their presence.  [Record No. 100-11, p. 202]  Under these

circumstances, Craycraft was justified in believing that Naselroad was aware of the officers' presence and attempting to escape and/or destroy evidence. *See Smith*, 386 F.3d at 759; *Bates*, 84 F.3d at 795; *Watson*, 63 F. App'x at 221.  Upon entering the curtilage, Craycraft reasonably believed that announcing his presence would have been futile. *See Richards*, 520 U.S. at 394. Consequently, if he did not re-announce his presence upon encountering Naselroad, he was justified in declining to do so.

Regarding Mabry (the officer who actually shot Naselroad), the Court notes that he was not aware of what Naselroad might have seen while in the residence.  However, upon rounding the corner of the woodshed and entering the backyard, he saw Naselroad pointing a gun in Craycraft's direction.  [Record No. 106, p. 28]  Thus, he had a justified belief that Craycraft was in imminent peril of bodily harm and did not need to identify himself. *See Smith*, 386 F.3d at 759.

### c.        Mabry Shooting Naselroad

Ultimately, the Court must determine whether Mabry's shot at Naselroad constituted excessive force under the circumstances.  When Mabry rounded the corner of the shed and entered the backyard, he saw Naselroad pointing a gun in Craycraft's direction.  [*Id.*]  He then ordered Naselroad to drop the gun at least two times.  [Record No. 103, p. 132]  Naselroad had sufficient time to look at Mabry and look back at Craycraft.  [Record Nos. 103, pp. 117−19; 100-12, p. 36]  When Naselroad failed to comply with the directive, Mabry shot him.  [Record No. 103, p. 133]  Under the factors set out in *Graham*, Naselroad posed an immediate threat to the officers' safety, and he appeared to have been fleeing the scene. *See Graham*, 490 U.S. at 396.  While the crime at issue was not severe or necessarily violent, the other two factors outweigh the effect of that factor. *See id.*  It was reasonable for Mabry to use deadly force

- 24 -

against a suspect who was pointing a gun at another officer and refusing to comply with the order to drop the weapon. *See Boyd v. Baeppler*, 215 F.3d 594, 604 (6th Cir. 2000); *Hammond v. Smith*, 408 F. Supp. 2d 425, 432 (E.D. Mich. 2005) (distinguishing cases like *Dickerson*, 101 F.3d at 1155, where issues of fact remained concerning whether the plaintiff pointed a gun at officers and whether the officers attempted a warning). Even if Craycraft and Mabry violated Naselroad's constitutional rights by using excessive force in drawing a weapon and shooting Naselroad, the plaintiff has failed to demonstrate that those rights were "clearly established" under the circumstances presented. *See Saucier*, 533 U.S. at 201.

### d.    Gurley and Puckett

To the extent Naselroad's Second Amended Complaint provides further factual support concerning Gurley's liability for a Fourth Amendment excessive force claim, the Court notes that Naselroad seems to present facts regarding a duty-to-protect theory, rather than a theory of active participation. [Record No. 43, ¶¶ 37, 40] As stated with regard to Craycraft and Puckett in the March 26, 2015 Memorandum Opinion and Order, "[c]ourts have consistently declined to impose liability where, as here, the events transpired over a few seconds." *See Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 506 (6th Cir. 2007); *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990). [Record No. 107, p. 18] For the same reasons discussed in the earlier Memorandum Opinion, the facts do not support a duty-to-protect theory against Gurley.

Regarding Puckett, although the Second Amended Complaint alleges that he was involved in the seizure of the plaintiff in the backyard [Record No. 43, ¶ 39], the facts have demonstrated otherwise. [Record No. 104, pp. 185−86] Therefore, a Fourth Amendment excessive force claim cannot stand against him.

### 3.    Municipal Liability

In Count I, the plaintiff also alleges Fourth Amendment violations against Craycraft, Gurley, and Puckett, in their official capacities, and the entity-defendants under 42 U.S.C. § 1983.  [Record No. 43, ¶ 47]  A claim against the officers in their official capacities is really a claim against the entities.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Edmonson Cnty. v. French*, 394 S.W.3d 410, 414 (Ky. Ct. App. 2013).  Naselroad is not contesting the City of Paris' request for summary judgment.  [Record No. 112, p. 4]  Therefore, only the municipal liability claim against Berl Purdue, in his official capacity, and Clark County remains.

"A defendant cannot be held liable under section 1983 on a *respondeat superior* or vicarious liability basis."  *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (citing *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978)).  Instead, the plaintiff must allege that a policy or custom of the defendant entity caused the deprivation at issue.  *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012).  If the plaintiff asserts that a policy caused the violation at issue, he must identify that particular policy and present facts indicating that the policy was the "moving force" behind the violation.  *See Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012); *Ghaster v. City of Rocky River*, No.  1:09-cv-2080, 2010 WL 2802685, at *7 (N.D. Ohio May 12, 2010) (dismissing *Monell* claim where plaintiff failed to allege facts indicating that the city had a policy of depriving citizens of their First or Fourth Amendment rights).

However, if the plaintiff claims that a custom of "inaction" existed, he must allege that the entity's failure to train evidenced "deliberate indifference" towards the plaintiff and those similarly situated.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  One way the plaintiff

- 26 -

may establish deliberate indifference is by presenting evidence of: (i) a clear and persistent pattern of unconstitutional conduct by the entity's agents; (ii) the entity's actual or constructive notice of that conduct; (iii) the entity's tacit approval of that conduct; and (iv) by demonstrating that the failure to train was the moving force behind the conduct at issue. *D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014) (affirming district court's grant of judgment on the pleadings to defendant where complaint failed to properly allege custom-of-inaction theory). Deliberate indifference is also shown where the plaintiff alleges inadequate training "in light of foreseeable consequences that could result from the lack of instruction." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999). In such a case, the plaintiff must present evidence that the "inadequacy is closely related to or actually caused the plaintiff's injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (internal quotation marks and citation omitted).

In this case, Naselroad does not assert that an identified policy of Berl Purdue and Clark County (the "Clark County Defendants") caused the deprivation at issue. Instead, he claims that "there is no specific written policy regarding how to properly effect a 'knock and talk' procedure." [Record No. 111, p. 15] Because Naselroad alleges a custom of "inaction," he must demonstrate that the Clark County Defendants were deliberately indifferent. *See D'Ambrosio*, 747 F.3d at 387; *Brown*, 172 F.3d at 931. The plaintiff states that he "is not in a position to maintain that there has been a repeated violation by the Clark County Defendants or its employees." [*Id.*] As a result, Naselroad must show that inadequate training foreseeably resulted in his injury. *See Plinton*, 540 F.3d at 464.

Assuming the officers' training was inadequate because it did not involve a written knock and talk procedure, the Court turns to the question of causation. Contrary to the plaintiff's assertion, the officers' conduct on October 8, 2013, resulted not from a failure to properly conduct a knock and talk, but rather from an entry onto Naselroad's curtilage without a warrant. For example, if the officers had failed to identify themselves to Jeannie Naselroad or had overstayed their welcome while speaking with her, they would have improperly conducted the knock and talk. However, when Craycraft and Mabry ran to the breezeway and backyard, they entered the curtilage without a warrant. While that entry would have been justified by an extended knock and talk if Ms. Naselroad had not opened the door, under the circumstances presented, it was only justified by exigent circumstances. Naselroad does not contend that Clark County or Purdue failed to promulgate or establish a written policy regarding warrantless searches, and Clark County has presented evidence that such policies were included in its manual. [Record No. 105, pp. 38, 50−52] Because the inadequate knock and talk policy is not closely related to Naselroad's injury, the plaintiff's claim fails as a matter of law.[20] *See Plinton*, 540 F.3d at 464. Therefore, the Fourth Amendment claim against the defendant-entities will be dismissed.

**B.      Count II – Conspiracy to Violate Civil Rights**

In Count II, under 42 U.S.C. §§ 1983 and 1985, Naselroad contends that the defendant-officers conspired to violate his constitutional rights by both apprehending him and later prosecuting him. [Record No. 43, ¶¶ 48−52] However, the plaintiff now states that he is not

---

[20]      Further, because the Court determined that no constitutional violations occurred with respect to the search and seizure and excessive force claims, the plaintiff cannot sustain the municipal liability claim. *See Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 767 n.9 (6th Cir. 2010).

asserting a claim under § 1985.  [Record No. 112, p. 5]  The defendants assert that they are
entitled to qualified immunity with respect to the conspiracy claim and that the facts do not
support such a claim.  [Record Nos. 95-1, p. 20; 97, p. 20; 100-2, p. 32]

> In the Sixth Circuit,
>
> [a] civil conspiracy is an agreement between two or more persons to injure
> another by unlawful action.  Express agreement among all the conspirators is
> not necessary to find the existence of a civil conspiracy.  Each conspirator need
> not have known all of the details of the illegal plan or all of the participants
> involved.  All that must be shown is that there was a single plan, that the alleged
> coconspirator shared in the general conspiratorial objective, and that an overt
> act was committed in furtherance of the conspiracy that caused injury to the
> complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943−44 (6th Cir. 1985).  Naselroad concedes that he has been
"unable to produce specific evidence of a conspiracy."  [Record No. 111, p. 15]  Instead, he
merely highlights that: (i) he never pointed his weapon "directly at" the officers; (ii) he was
acquitted of the wanton endangerment charges; and (iii) the officers had a "debriefing" meeting
after the shooting and maintained contact afterwards.  [*Id.*, p. 16]

There is no evidence of a discussion of illegal motives or activities with regard to the
Wal-Mart meeting before the knock and talk.  Rather, the officers were acting pursuant to a
reliable tip. [Record No. 108, p. 9]  Nor is there any indication that the officers knew Naselroad
would be home or that they discussed any illegal activities while at the home.  Further, the
evidence establishes that Naselroad did, in fact, point his gun in Craycraft's direction, even if
it was in the "low ready" position. [Record No. 103, pp. 111−12, 117, 132, 147]  Naselroad's
acquittal might speak to the reasonableness of the officers' and his actions, but it does not
provide evidence of a single plan.  *See Hooks*, 771 F.2d at 944.  Lastly, regarding debriefing
and the officers "checking on" each other, "these pieces of circumstantial evidence are just as

consistent with a legitimate police investigation as with a conspiracy," so they are "insufficient to support an inference of conspiracy."  *See Womack v. Conley*, 595 F. App'x 489, 494 (6th Cir. 2014).   As a result, the civil conspiracy claim against the officers cannot withstand summary judgment.

### C.    Count III – Assault and Battery Against Defendant Mabry

Mabry also asserts that the plaintiff's state law assault and battery charge against him should be dismissed for the same reasons as the excessive force claim.[21]  [Record No. 100-2, p. 34]  Naselroad "largely agrees."  [Record No. 110, p. 17]

In Kentucky, police officers enjoy qualified immunity from tort liability for discretionary acts performed in good faith and within the scope of their authority.  *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  If the defendant establishes the act was discretionary

---

[21]    Although in some circumstances it is more appropriate for the Court to decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed before trial, *see Gaff v. Fed. Deposit Ins. Corp.*, 814 F.2d 311, 319 (6th Cir. 1987), it is appropriate for the Court to exercise supplemental jurisdiction where the federal claims have substance sufficient to confer subject matter jurisdiction.  *See Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1413 (6th Cir. 1991) (distinguishing dismissal on summary judgment standard from dismissal on Rule 12(b)(6) standard); *see also Voticky v. Village of Timberlake*, 412 F.3d 669, 675 (6th Cir. 2005) (section 1983 case involving both federal and state law claims).  This is especially true where there is "substantial similarity between the predicate factual findings necessary to the resolution of both federal and state claims."  *Aschinger*, 934 F.2d at 1412.

Here, the negligence, negligent supervision, false imprisonment, and IIED claims depend on whether the officers' actions were reasonable.  Additionally, because the malicious prosecution claim requires as an element a lack of probable cause for the wanton endangerment charges, the reasonableness of the officers' actions plays a role in the determination of that claim.  Ultimately, the "commonsense policies of judicial economy outweigh any benefit in allowing" a Kentucky court to decide the state law claims.  *See id.* at 1413; *see also Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996) ("The vast majority of pretrial dismissals, such as a dismissal on a motion for summary judgment, do not affect the trial court's ability to resolve supplemental claims."); *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) (interests of judicial economy and fairness favored retention of jurisdiction where parties completed discovery, summary judgment motion was extensively briefed, and federal claim was not abandoned until filing of amended complaint).

and within the scope of his authority, the burden shifts to the plaintiff to show that the act was not performed in good faith. *Id.* at 523. Bad faith is demonstrated by violation of a clearly established right or if the officer "willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.*

"Police officers generally have a privilege to use reasonably necessary force to preserve order." *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 923 (E.D. Ky. 2008) (citing *Lawson v. Burnett*, 471 S.W.2d 726, 728–29 (Ky. 1971)). Here, the Court has determined that Mabry's actions on October 8, 2013, were objectively reasonable. And the plaintiff has not provided evidence from which a reasonable juror could infer subjective bad intent on the part of Mabry. *See Yanero*, 65 S.W.3d at 523. Consequently, the assault and battery claim against Mabry will be dismissed for the same reasons as the dismissal of the excessive force claim against him. *See Atwell v. Hart Cnty.*, 122 F. App'x 215, 219 (6th Cir. 2005).

### D.      Counts V and VI – Negligence Against Officers and Entity-Defendants

Naselroad alleges in Count V that the officers acted negligently in allowing excessive force to be used against him. [Record No. 43, ¶¶ 59−64] He also claims that the entity-defendants are liable under a *respondeat superior* theory. [*Id.*, ¶ 65] And in Count VI, the plaintiff asserts negligence against the entity-defendants for failing to properly train or supervise their officers with regard to proper knock and talk procedures. [*Id.*, ¶¶ 66−71] Naselroad does not contest summary judgment in Puckett's and the City of Paris' favor with respect to the negligence and negligent supervision claims. [Record No. 112, p. 4]

As discussed above, the negligence claim was dismissed as to Craycraft, Gurley, and their respective entities [Record No. 42, p. 16], meaning that it only remains as to Mabry. To the extent Naselroad argues that the claim is reinstated, the Court notes that a duty to prevent

harm only arises where a special relationship exists.  *See City of Florence v. Chipman*, 38 S.W.3d 387, 392 (Ky. 2001).  Such a special relationship requires that the suspect be in custody or restrained by the state when the injury-producing act occurred.  *Id.*  The plaintiff still fails to identify an action or inaction by Craycraft or Gurley breaching a duty after it arose, especially where the events transpired in a matter of seconds.  *See Ontha*, 222 F. App'x at 506.  [Record No. 42, pp. 8, 13]  Thus, the negligence claim against Craycraft and Gurley cannot survive summary judgment.  Further, under a *respondeat superior* theory, the claim cannot survive against Clark County and Purdue, in his official capacity.  *See Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 733 (Ky. 2009).

In addition, the negligent supervision claim was dismissed as to the Kentucky State Police, Clark County, and Berl Purdue, in his official capacity, due to sovereign immunity.  [Record Nos. 35; 42, p. 13]  The claim was dismissed as to Purdue, in his individual capacity, due to qualified immunity.  [Record No. 42, p. 14]  The plaintiff has not made any argument why sovereign immunity would not still apply, and he has not demonstrated an absence of good faith regarding Purdue's discretionary function of promulgating procedures and training officers.  *See Yanero*, 65 S.W.3d at 522.  Consequently, to the extent the negligent supervision claims were reinstated against these defendants by the Second Amended Complaint, they fail to withstand summary judgment.

Turning to the remaining negligence claim against Mabry, the Court notes that Naselroad's negligence claim against that defendant is premised on the same behavior constituting the subject of the search and seizure and excessive force claims.  For example, the plaintiff states that the police "owed a duty to Plaintiff to perform their police duties without the use of intimidation, coercion and physical abuse upon Plaintiff and without violating the

constitutional and statutory rights of Plaintiff."  [Record No. 43, ¶ 60]  Where a battery allegedly escalates into excessive force, "[t]o permit a separate claim for negligence creates the risk that a jury would assume that, even if no excessive force were used, the officer might somehow still be liable for some undefined negligence.  Such a result is doctrinally unsupportable and unacceptable . . ." *Ali v. City of Louisville*, 3:05CV-427-R, 2006 WL 2663018, *8 (W.D. Ky. Sept. 15, 2006).  Because "negligence is not the proper action" for addressing Mabry's conduct, the Court will grant Mabry summary judgment concerning this claim.  *See Walker v. City of Lebanon*, No. 3:12-CV-855-H, 2013 WL 6185402, *9 (W.D. Ky. Nov. 25, 2013).[22]

### E.    Count VII - False Imprisonment Against Officers and Entity-Defendants

In Count VII, the plaintiff alleges false imprisonment against the officers and their respective entities through the doctrine of *respondeat superior*.  [Record No. 43, ¶¶ 72−77]  Specifically, this claim encompasses "the moment of Defendants' confronting Plaintiff in Plaintiff's back yard, continuing through the wrongful shooting of Plaintiff, and continuing through the wrongful and false arrest of Plaintiff on [October] 8, 2013, and continuing until Plaintiff was finally released from police custody, . . ."  [*Id.*, ¶ 76]

"A law enforcement officer is liable for false imprisonment unless he or she enjoys a privilege or immunity to detain an individual."  *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007).  Imprisonment occurs when an officer intentionally confines a plaintiff and the plaintiff is aware of such confinement.  *Id.* In other words, a false imprisonment claim lies where the

---

[22]    To the extent the negligence claim is a duty-to-protect claim, even if Mabry owed Naselroad a duty, such a duty only arose when Naselroad was confined to the backyard.  Because the events transpired within a matter of seconds, Mabry did not have a responsibility to intervene with regard to Craycraft drawing his weapon.  *See Ontha*, 222 F. App'x at 506.

defendant unlawfully acts by force or threat of force with the intent to confine the plaintiff to an area certain.  *See Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 278 (Ky. Ct. App. 1981).  "An officer making an arrest without a warrant in the reasonable and good faith belief that a misdemeanor is being committed in his presence is not liable for false imprisonment, even though it develops that the arrestee is not guilty of any offense."  *See McCray v. City of Lake Louisvilla*, 332 S.W.2d 837, 842 (Ky. Ct. App. 1960).

At the outset, the Court notes that Gurley did not confine Naselroad to his backyard.  Naselroad admits that he did not see Gurley until after he was shot.  Thus, the plaintiff has not produced evidence supporting a false imprisonment claim against Gurley.  *See Dunn*, 226 S.W.3d at 71.  [Record No. 103, p. 135]  Further, the plaintiff concedes that the false imprisonment claim cannot lie against Puckett and the City of Paris.  [Record No. 112, p. 4]

Regarding Craycraft, the plaintiff was not confined to his backyard until Craycraft drew his weapon.  Prior to that point, Craycraft was merely attempting to speak with Naselroad, rather than threatening him in any way.  [Record No. 103, pp. 101, 113, 116]  Because Craycraft drew his weapon in response to Naselroad brandishing his weapon, Craycraft was privileged to "confine" Naselroad in this way.[23]  *See Dunn*, 226 S.W.3d at 71; *McCray*, 332 S.W.2d at 842; *see, e.g.*, *Thomas v. Commonwealth*, 567 S.W.2d 299, 300 (Ky. 1978) (describing wanton endangerment); *Hatfield v. Commonwealth*, 254 S.W. 748 (Ky. Ct. App. 1923) (threatening language and brandishing of gun in presence of officer constitute breach of peace).

---

[23]   Craycraft argues that he is not liable for false imprisonment because he did not confine Naselroad to an "area certain," based on Naselroad's continuing movements uphill.  [Record No. 115, p. 9]  However, *Hay* indicates that the defendant need only "intend" to confine the plaintiff to an area certain.  627 S.W.2d at 278.

Likewise, Mabry was entitled to "confine" Naselroad by using deadly force where Naselroad was pointing his weapon in another officer's direction and ignoring commands to drop the weapon.  [Record No. 103, p. 232]  Naselroad admitted that he was unaware of Mabry's presence until Naselroad had already pointed his gun at Craycraft.  [*Id.*]

Regarding the subsequent arrest of the plaintiff on wanton endangerment charges [*see* Record No. 95-6], the evidence indicates that the officers, including Mabry, had a reasonable, good-faith belief that a felony was committed in their presence.  *See McCray*, 332 S.W.2d at 842.  A person commits wanton endangerment when he "wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person" under "circumstances manifesting extreme indifference to the value of human life."  Ky. Rev. Stat. § 508.060.  At that point, the officers had witnessed Naselroad point his gun at Craycraft and refuse to put it down.   Such facts support a charge of wanton endangerment, as evidenced by the grand jury indictment.  [Record No. 95-7]  Because the officers were entitled to detain Naselroad on October 8, 2013, summary judgment will be granted in the defendants' favor with respect to the false imprisonment claim.[24]

### F.     Count VIII - Malicious Prosecution Against Officers and Entity-Defendants

The plaintiff states a malicious prosecution claim against the officers and their respective entities for instituting three wanton endangerment charges against him.  [Record No. 43, ¶¶ 78−83]  The elements for a malicious prosecution claim are: (i) the institution or continuation of judicial proceedings; (ii) by, or at the instance of, the plaintiff; (iii) the

---

[24]     Any confinement after the arrest not directly attributable to the aforementioned events will be discussed below in the malicious prosecution claim.

termination of such proceedings in defendant's favor; (iv) malice; (v) want or lack of probable cause; and (vi) damages.  *Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981).

Judicial proceedings were instituted against Naselroad for wanton endangerment, as well as drug offenses.  [Record No. 95-7]  However, regarding the second element, it does not appear that the proceedings were instituted by, or at the instance of, the defendants.  Detective Keeton of the Kentucky State Police filed the wanton endangerment charges.  [Record No. 95-6]  Although the officers testified at the trial, testimony does not impose liability on a person or entity.  *See Farris v. Sears, Roebuck & Co.*, 455 F. Supp. 162, 164 (W.D. Ky. 1978).  Further, the "initiation or encouragement of the prosecution lies at the heart of an action in malicious prosecution."  *Id.* (citing *Munday v. Gott*, 146 Ky. 177, 142 S.W. 238 (1912)).  The plaintiff makes no argument that the officers or their entities initiated or encouraged the prosecution.  As a result, Naselroad fails to satisfy the second prong of the malicious prosecution claim.  *See Raine*, 621 S.W.2d at 899.

With respect to the third element, the plaintiff demonstrates that he was acquitted of the three wanton endangerment charges.  [Record Nos. 95-8; 97-8]  Although he was convicted of two of the drug charges, the defendants have not provided the Court with a case barring a malicious prosecution claim where the plaintiff was acquitted of some charges but convicted of others, and the charges were based on different conduct.  Further, precedent refers to the "termination of the proceedings complained of."  *Basham v. Citizens' Loan Co.*, 287 S.W. 719, 719 (Ky. Ct. App. 1926).  Here, Naselroad is complaining about the wanton endangerment charges, not the drug charges.  Consequently, the Court will not determine the issue on this basis.

- 36 -

Regarding the fourth element, because there is no direct evidence of malice, it may only "be inferred from proof or want of probable cause." *See Farris*, 455 F. Supp. At 164 (citing *Hendrie v. Perkins*, 240 Ky. 366, 42 S.W.2d 502 (1931)). Naselroad submits as inferential proof the events of October 8, 2013. [Record No. 111, p. 18] As explained above, those events support the wanton endangerment charges instituted against Naselroad and do not raise an inference of malice. Although the Second Amended Complaint alleges that the officers gave false reports and statements [Record No. 43, ¶ 82], the evidence does not support those allegations.

Thus, the Court turns to the element of lack of probable cause. An indictment is *prima facie* evidence of probable cause, meaning it creates a rebuttable presumption of probable cause. *See Condor v. Morrison*, 121 S.W.2d 930 (1938). In the present action, the defendants have shown that there was an indictment by a grand jury. [Record No. 95-7] Consequently, there is a presumption that the wanton endangerment charges were based on probable cause. An acquittal is not evidence of lack of probable cause. *See Womack*, 2013 WL 5966903, at *17; *Conder*, 121 S.W.2d at 931. As a result, Naselroad's only "evidence" to rebut the presumption of probable cause is the way in which the events transpired. For instance, Naselroad avers that the charges were "unfounded" because he never pointed his weapon at the officers. [Record No. 112, p. 6] However, the plaintiff's deposition revealed this to be false. [Record No. 103, pp. 132; 147] Under the circumstances presented, Naselroad has failed to present evidence from which to infer a lack of probable cause. *See Raine*, 621 S.W.2d at 899. Moreover, even if he rebutted the presumption of probable cause, he has not made a "clear showing" of malice in addition to the rebuttal. *See Farris*, 455 F. Supp. at 164. For these reasons, Naselroad's malicious prosecution claim against the individual defendants, and

- 37 -

their respective entities through *respondeat superior* theory, cannot withstand summary judgment.

### G.    Count IV – Intentional Infliction of Emotional Distress or "Outrage"

Naselroad also asserts an IIED claim against the defendant-officers for shooting him and subsequently prosecuting him. [Record No. 43, ¶¶ 56−58] The claim remains as to Mabry and Puckett, who contend that an IIED claim is only a "gap-filler," as discussed in the Court's March 26, 2015 Memorandum Opinion and Order. [Record Nos. 42, p. 11; 100-2, p. 35] Conversely, the plaintiff alleges that if the Court dismisses the civil rights or assault and battery claims, it should allow the IIED claim to remain. [Record No. 110, p. 18]

The tort of outrage is permissible where the defendants "solely intended to cause extreme emotional distress." *Green v. Floyd Cnty.*, 803 F. Supp. 2d 652, 655 (E.D. Ky. 2011) (citing *Brewer v. Hillard*, 15 S.W.3d 1, 7–8 (Ky. Ct. App. 1999)). "When the claim of emotional distress is a supplement to another tort claim, such as false imprisonment, the burden of showing sole intent cannot be met." *Lovins v. Hurt*, Civil Action No. 11-216-JBC, 2011 WL 5592771, at *3 (E.D. Ky. Nov. 16, 2011) (citing *Rigazio v. Archdiocese of Louisville,* 853 S.W.2d 295, 299 (Ky. Ct. App. 1993)).

Traditional tort claims are available to Naselroad, such as: assault, battery, malicious prosecution, and false imprisonment. Further, these claims allow for the recovery of emotional distress damages. *See Banks v. Fritsch*, 39 S.W.3d 474, 476 (Ky. Ct. App. 2001). Naselroad's IIED claim cannot even survive the motion to dismiss standard because he never alleges that the officers' actions were "solely intended to cause extreme emotional distress." *See Green*, 803 F. Supp. 2d at 655; *see also Vidal v. Lexington Fayette Urban Cnty. Gov't*, Civil Action No. 5: 13-117-DCR, 2014 WL 4418113 (E.D. Ky. Sept. 8, 2014). This case is dissimilar to

*Brewer*, where a jury could reasonably conclude that the officers' actions were solely intended to cause emotional damage. *See Brewer*, 15 S.W.3d at 8 (addressing sexual harassment). Moreover, because the officers' October 8, 2013 actions were reasonable, the plaintiff cannot demonstrate that the officers' conduct was "extreme and outrageous" on the day in question. *See Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984). With respect to an outrage claim premised on the officers' participation in Naselroad's prosecution, because the prosecution was not malicious, "it follows that Defendant[s] did not act outrageously." *See Powell v. Cornett,* No. 3:11-CV-628-H, 2013 WL 1703746, *6 (W.D. Ky. Apr. 19, 2013).

**IV.**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      The motions for summary judgment filed by Defendants Dennis Mabry, Mark Craycraft, John Gurley, Robert Puckett, Berl Purdue, the City of Paris, and Clark County [Record Nos. 95; 97; 100] are **GRANTED**.

2.      Plaintiff Joel Naselroad's claims are **DISMISSED**, with prejudice.

3.      The motions to exclude [Record Nos. 98; 99; 101] are **DENIED**, as moot.

4.      This action is **DISMISSED**, with prejudice, and **STRICKEN** from the Court's docket.

5.      The pre-trial conference previously scheduled for May 11, 2016, and trial scheduled to begin June 21, 2016, are **CANCELED**.

6.      A corresponding Judgment shall issue this date.

This 22nd day of April, 2016.

Signed By:

*Danny C. Reeves* DCR

**United States District Judge**